taken by them respectively, together with interest thereon; and (2) in the event of it being adjudged that the said receipts are valid and effective as against the plaintiff, and that the defendants were entitled to hold and sell the goods and collect the accounts receivable, purporting to be covered thereby as security for their loans, that then the said defendants make full disclosure and discovery to the plaintiff of all the acts and things done by each and all of them with respect to said goods, and of the disposition of the proceeds thereof, and that the defendants pay to the plaintiff such amounts, with interest, as may be determined to have been received by each of them respectively in excess of the amount to which they were entitled as the proceeds of the sales upon which they each had liens as pledgees.

When the foregoing facts are considered in connection with the prayer for judgment, it is clear there are several causes of action pleaded. There are three causes of action for conversion: The first, for goods covered by the warehouse receipts delivered to Fish & Boldt, and this in no way affects the United States Mortgage & Trust Company; the second, for goods covered by receipts delivered to the United States Mortgage & Trust Company, and this in no way affects Fish & Boldt; and the third, for goods covered by receipts delivered to the warehousing company, and this in no way affects either the United States Mortgage & Trust Company or Fish & Boldt. There is also, in case the receipts are declared invalid, a fourth cause of action which affects all of the defendants; that is, an accounting by them of the proceeds received on the sale of the goods in excess of what was sufficient to satisfy their respective loans in full. The defendants, therefore, were entitled, under section 483 of the Code of Civil Procedure, to have these causes of action separately stated and numbered, to the end that they may raise the question of misjoinder or sufficiency, by demurrer. Cohn v. Jarecky, 90 Hun, 266, 35 N. Y. Supp. 935; Westheimer v. Musliner, 46 App. Div. 96, 61 N. Y. Supp. 348.

It follows that the order appealed from must be reversed, with $10 costs and disbursements, and the motion granted, with $10 costs. All concur.

LAUGHLIN, J. I concur in the result. I am of opinion that a demurrer would lie without first separately stating and numbering the causes of action, but the Code of Civil Procedure (section 483) requires that causes of action shall be stated and numbered separately, and this requirement should be complied with.

---

(96 App. Div. 323.)

TOPHAM v. INTERURBAN ST. RY. CO.

(Supreme Court, Appellate Division, First Department. July 13, 1904.)

1. STREET RAILROADS—LEASES—PASSENGERS—TRANSFERS.

By Railroad Law, § 78 (Laws 1892, p. 1398, c. 676), authority is given any corporation owning or operating any railroad to contract with any other such corporation for the use of their respective roads or routes, or any part thereof; but that section contains a provision that "nothing in this section shall apply to any lease in existence prior to May the first,

1891." Section 104 (page 1406) provides that "every such corporation entering into such contract" shall give to each passenger paying a single fare a transfer entitling such passenger to a trip to any point on any road embraced in the contract. *Held*, that section 104 applies to contracts made pursuant to section 78, and hence has no application to contracts made before the date specified in section 78.

2. SAME—LEASES—LINES EMBRACED IN CONTRACT.

Where a street railroad company leased its lines to the H. Street Railroad Company prior to May, 1891, and after such date another railroad company leased its lines to the H. Company—the latter lease making no reference to the other lease, and there being no recital that the lessee was operating any railroad—and thereafter the lessee road consolidated with other roads, and the consolidated road leased all the lines to defendant. defendant was not required to give a transfer from one to the other of the lines leased to the H. Road.

O'Brien, J., dissenting in part.

Appeal from Municipal Court, Borough of the Bronx, Second District.

Action by Henry R. Topham against the Interurban Street Railway Company. From a judgment of the Appellate Term (86 N. Y. Supp. 295) reversing a judgment of the Municipal Court in favor of defendant, it appeals. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

Paul D. Cravath, for appellant.

Edward B. Whitney, for respondent.

HATCH, J. This appeal comes before this court upon the allowance of an appeal by the justices of the Appellate Term. Mr. Justice Freedman, in a learned and exhaustive opinion, has traced the history of the statutory law of the state bearing upon the authority conferred by the Legislature upon street surface railroads to construct, operate, lease, and enter into traffic contracts from the inception of the right down to the present time, and reached the conclusion that the lease entered into between the defendant and the Metropolitan Street Railway Company was made and executed pursuant to the provisions of the railroad law as it now exists (Laws 1892, p. 1382, c. 676), and that section 104, p. 1406, of that act, is not limited to traffic contracts alone, but embraces contracts of lease as well. With that conclusion we agree. The same question was considered by this court, and the same conclusion reached, in Mendoza v. Metropolitan Street Railway Company, 48 App. Div. 62, 62 N. Y. Supp. 580; s. c., on motion for reargument, 51 App. Div. 430, 64 N. Y. Supp. 745. It was also adverted to by the Appellate Division in the Second Department, and the same result asserted, in Barnett v. Brooklyn Heights R. R. Co., 53 App. Div. 432, 65 N. Y. Supp. 1068. Since that decision, we have been furnished with a manuscript copy of the opinion delivered by the same court in O'Reilly v. Brooklyn Heights R. R. Co., 89 N. Y. Supp. 41, wherein that court has decisively determined that the construction of the statute in this respect was the same as had been announced by that court in its former decision, and by the decisions of this court. Whatever difference of view presently exists in this court upon this subject, I do not

deem it necessary to re-examine this question, as the matter has been so thoroughly discussed by the learned court below, and so decisively determined in the other cases adverted to, that such question, so far as the Supreme Court is concerned, ought to be regarded as settled.

We also agree with the learned court below that the statute in question authorizes the recovery of cumulative penalties in one action. The language upon such subject is, "for every refusal." This language was held in Suydam v. Smith, 52 N. Y. 383, to permit the recovery of cumulative penalties, and that case distinguishes Fisher v. New York Cent. & H. R. R. R. Co., 46 N. Y. 644. The same distinction is maintained in all the subsequent decisions upon the subject. The Second Department, in Suffolk County v. Shaw, 21 App. Div. 146, 47 N. Y. Supp. 349, adopted the same construction, holding that the language is equivalent to "each and every." Cox v. Paul, 175 N. Y. 328, 67 N. E. 586, is not in conflict with this conclusion. The language of the statute in that case was, "for any refusal * * * the officer or agent so refusing shall each forfeit." The court held that, from the language of the statute, but one penalty could be recovered, and that the word "any" was not the equivalent of "each" or "every." The language in the present case is different, and this is ground for the difference in conclusion.

As I view this case, however, this determination of these questions in favor of the plaintiff does not suffice to show that he is necessarily entitled to a recovery in this action; nor does it result in the affirmance of the order from which the appeal is taken. The real question which the case presents turns upon the construction to be given to section 104 of the railroad law (Laws 1892, p. 1406, c. 676). If that section is to be construed as constituting a mandatory provision by the Legislature that the defendant shall, upon demand, and without extra charge, give to each passenger paying one single fare a transfer over its line of railroads at any point of intersection with a leased line, then there is an end of this case, and the judgment must be affirmed. If, however, that section be construed as authorizing the defendant, in the operation of its railroad, to so operate the same, and furnish transfers to passengers at such points upon its intersecting lines, as will best serve the convenience of the traveling public, by designating particular transfer points, and that such designations will accomplish the purpose of the act, then compliance therewith will have been shown. In order to have a clear view of this question, the provisions of the section are to be carefully scrutinized. It reads:

"Sec. 104. Contracting Corporations to Carry for One Fare—Penalty. Every such corporation entering into such contract shall carry or permit any other party thereto to carry between any two points on the railroads or portions thereof embraced in such contract any passenger desiring to make one continuous trip between such points for one single fare, not higher than the fare lawfully chargeable by either of such corporations for an adult passenger. Every such corporation shall upon demand, and without extra charge, give to each passenger paying one single fare a transfer, entitling such passenger to one continuous trip to any point or portion of any railroad embraced in such contract, *to the end that the public convenience may be promoted by the operation of the railroads embraced in such contract substantially as a single railroad with a single rate of fare.* For every refusal to comply with the requirements of this section the corporation so refusing shall forfeit fifty dollars to the aggriev-

ed party. The provisions of this section shall apply only to railroads wholly within the limits of any one incorporated city or village."

The primary purpose of this section is to compel the railroad corporation to carry over the lines of road operated by it passengers by such method as will best promote the convenience of the public who travel thereon. The learned court below assumed that the section was to be construed as mandatory provisions, requiring that a transfer should be given at every intersecting point, and, in disposition of the suggestion that the corporation might adopt rules or a method in carrying the public over its lines by which transfers might be .denied at some points, said:

"The fact that there was another route embraced within the defendant's system, over which the plaintiff on each occasion might have traveled for a single fare, can make no difference; and the fact that the giving of transfers at the point in question might cause undue crowding in the street and at the crossing is no excuse for not giving them, unless sanctioned by legislative action."

No further discussion of such subject was had in making disposition of the question. It is evident that, if the words of the provision which we have italicized do nothing more than declare that the issuance of transfers at all intersecting points will promote the public convenience, then such language might as well have been omitted from the section, as it neither adds to nor takes from the preceding provisions of the section, as the language therein contained is clearly mandatory. Indeed, the injection of this language into the section creates, in this view, somewhat of ambiguity, if it is to be thus limited, as it in no wise adds to the clearness of the preceding provision. The intent of the Legislature is the cardinal rule by which statutes are to be interpreted. It was said by the Presiding Justice of this court in Central Trust Co. v. New York Equipment Co., 74 Hun, 405, 26 N. Y. Supp. 850:

"A strict and literal interpretation is not always to be adhered to, and, where the case is brought within the intention of the makers of the statute, it is within the statute, although by a technical interpretation it is not within its letter. It is the spirit and purpose of a statute which is to be regarded in its interpretation, and, if this find fair expression in the statute, it should be so construed as to carry out legislative intent, even though such construction is contrary to the literal meaning of some of the provisions of the statute. A reasonable construction should be adopted in all cases where there is a doubt or uncertainty in regard to the intention of the lawmakers."

And this rule is abundantly supported by authority, and variously illustrated in the cases. People ex rel. Savings Bank v. Butler, 147 N. Y. 164, 41 N. E. 416. It was said by Ruger, J., in People ex rel. Collins v. Spicer, 99 N. Y. 225, 1 N. E. 680:

"In looking for the intent of the Legislature, not only the language of the statute may be resorted to, but also the circumstances which occasioned its enactment, and the object professed in its title; and, if by these aids the intent of the act can be clearly ascertained, effect may be given to it, although no retrospective words are contained in the law."

"When a general intention is expressed, and also a particular intention incompatible with the general intention, the particular intention is to be considered in the nature of an exception." People ex rel. Churchyard v. Board of Councilmen (Super. Buff.) 20 N. Y. Supp. 51, affirmed on opinion below in 135 N. Y. 660, 32 N. E. 648.

In Murray v. N. Y. C. & H. R. R. R. Co., 3 Abb. Dec. 339, it was held that the letter of a statute would be restrained by the spirit of the enactment, even though a liability imposed thereby was without qualification. In that case the obligation imposed by the statute was to make the railroad company liable for damages which should be sustained when fences alongside of its tracks were not in good repair. The court held that, although the language was mandatory and absolute, it was intended thereby to impose a liability only in case of negligence. The purpose here sought to be accomplished was to procure, for a single rate of fare, transfers over the lines of railroad operated by the defendant, by such method as would promote the public convenience in transportation. The convenience of particular individuals is not the scheme or purpose of its enactment, but it is to be administered, having for its object the greatest good and the largest convenience for the greatest number. If it should be admitted that the public convenience would be best subserved by rules and regulations fixing certain points where transfers should be issued, and denying them at others, there can be no doubt but that the legislative intent would be carried out, as the public convenience would be conserved thereby. If traffic would be congested and rendered dangerous by compelling compliance with the act as a mandatory provision at every intersecting point, and thereby rapid transit would be retarded, it is evident that the public convenience, instead of being promoted, would be hindered. It is asserted that such would be the fact, and, if this be so, to construe the provision as mandatory would result in nullifying the plain legislative intent, and render nugatory the language which declares the purpose of the act. It is easy to say that the Legislature has provided a scheme, and that, by following that scheme, public convenience will be the result; but that is not what the statute says. Its language is, "to the end that the public convenience may be secured." It is not that it "will be," but that it "may be." It is not that the railroad "shall be" run as a single line, but that it may be "substantially" run as such line, to the end that the public convenience shall be secured. Manifestly, if transfers are provided at intersecting points, whereby the convenience of the public is secured, and it would not be so secured by transfers at all points, the intent of the statute, by adopting the former course, will have been carried out, and the spirit of the statute will have been precisely applied. That some discretion has been left to the defendant in operation seems clear from the fact that the public convenience is to be secured, and the safety of the passenger safeguarded, and the road still run substantially as a single line. The defendant is not required to run it as a single line, but only so far as conditions and surrounding circumstances will permit, having regard at all times to the convenience of the traveling public. It is so well known that a railroad can only be operated upon a system, the product of rules and regulations, that courts may take judicial notice of such fact. Hunter v. N. Y., O. & W. R. Co., 116 N. Y. 615, 23 N. E. 9, 6 L. R. A. 246; Town of North Hempstead v. Gregory, 53 App. Div. 350, 65 N. Y. Supp. 867. Indeed, unless proper rules for management and operation are promulgated by railroad companies, it is an act of negligence which gives a civil remedy in damages to a person suffering injury arising out of such failure. This is the fa-

miliar rule.   No one can have seen an assembly of human beings await-
ing transportation over the lines of public rail transportation without
being painfully impressed with the necessity for rules and regulations
for their government, and for much discretion in management by the
carrier.   It oftentimes needs a more substantial structure than rules
to keep the traveling public within bounds, and thus prevent injury to
others and themselves.   For these purposes, structures of wood and
iron are the necessary concomitants of crowded public travel, rendered
necessary in the promotion of the public safety and convenience.   In
these respects, an onerous public responsibility has been imposed upon
the carrier of passengers, which courts rigidly enforce.   No one can
witness the congested character of many intersecting streets, without
being at once impressed with the necessity for the most careful system
in regulation in order to make such places reasonably safe; and to
add to such congestion by the diversion of traffic which now goes over
other lines would only aggravate such condition, and is quite likely to
create, not only public inconvenience, but danger to life and limb.   The
court may take judicial notice of conditions which exist at the inter-
section of Broadway and Twenty-Third street, and, in addition thereto,
such condition and the danger attendant upon the giving of transfers at
that point was established by proof upon the trial, as it was shown that,
if this were made a transfer point, a diversion of travel from other lines
to such point would be greatly increased, and the danger to passengers
and others at such point rendered hazardous.   If there be under this
statute no power of regulation in the issuance of transfers by the de-
fendant, then the selection of routes rests in the volition of each indi-
vidual passenger, and, if transfers are required to be given at each
intersecting point over all the lines of railroad operated by the defend-
ant, then any passenger may, at will, ride over any and all parts of the
boroughs of Manhattan and the Bronx, changing at as many intersect-
ing points as he arrives at, for a single fare of five cents.   Manifestly,
the Legislature never intended such result to flow from a construction
of the provision.   Clearly, the right secured to the passenger is the
right to be carried from the place where he boards the car in continuous
line, as near as may be, to his point of destination, and, in order to ac-
complish that result, the defendant is burdened with the responsibility
of so arranging its system of transfers as will promote the convenience
of the greatest number who travel over its line; and it is equally mani-
fest that in order to promote such convenience, and carry the people
who demand transportation during the so-called "rush hours" of the
day, it must have some system in respect thereto, or breed confusion and
danger.

I am of opinion, therefore, that the true construction of the section
vests somewhat of authority in the defendant to fix transfer points
where the convenience of the greatest number of the traveling public
will be subserved in going to and from their respective points of desti-
nation; and, if this result was obtained by the transfer points which
were established at the time when this action was brought, no right
of action existed, even though such right was denied at the particular
point.   When the defendant has made provision for the issuance of
transfers at intersecting points where the public convenience will be

promoted, it makes compliance with the act, even though under such
system it refuses transfers at some points.    The right in this respect
is not to be exercised arbitrarily, but reasonably, having regard to the
convenience of the largest number of passengers which it carries.    If
it does not make reasonable compliance in this respect, and provide the
best means for the convenience of the traveling public, it will violate
the provision and incur the penalty.

This construction of the statute, however, does not avail the defend-
ant in the present case, as it has pleaded no such defense in its answer,
nor has it proved the same upon the trial.    There is not a suggestion in
the answer that the defendant has at any time fixed transfer points
which will promote the convenience of the traveling public.    The near-
est approach to it is in paragraph 10, where it is averred that at the time
in question there were other lines of railway which the plaintiff might
have taken to reach his point of destination as easily and equally
as well as to use the lines mentioned and described in the complaint.
There is, however, no averment that these lines of road were under the
control of, or being operated by, the defendant; and, while such fact
can doubtless be determined by a reference to the lease, which is a part
of plaintiff's proof, yet there is no averment that it issued transfers at
intersecting points upon such line, or that it issued a transfer at its in-
tersection with Eighteenth street, which would have carried the plaintiff
to his destination.    An examination of the testimony also fails to
show that the defendant has made any compliance whatever with the
provisions of section 104, or that the plaintiff could have reached his
destination by a single fare over any line operated by the defendant.
The witness called to establish the fact of the issuance of the transfer
failed in his recollection upon such subject, and could not testify that
retransfers were issued; nor does it appear that such question has
been presented in such form as to be available to the defendant in any
of the cases now pending before this court.

Since the foregoing was written, Mr. Justice INGRAHAM has con-
sidered the whole subject in an opinion handed down herewith.    I con-
cur in his opinion so far as it affects the leases made prior to May 1,
1891, for the reasons assigned by him.    The provisions of section 78
(page 1398) expressly exclude its application to any lease in existence
prior to May 1, 1891.    The lease of the Broadway line falls within such
exception, in consequence of which there was no obligation resting up-
on the defendant to issue transfers at Twenty-Third street and Broad-
way.

My conclusion, therefore, is that the determination of the Appellate
Term in this case should be reversed, and the judgment of the Munic-
ipal Court affirmed, with costs.

LAUGHLIN, J., concurs.    VAN BRUNT, P. J., concurs in result.

INGRAHAM, J.    I do not agree in the construction given by the
learned court from which this appeal is taken to section 104 of the rail-
road law (chapter 676, p. 1406, Laws 1892).    I do not understand that
our decision in the case of Mendoza v. Met. St. Ry. Co., 48 App. Div.
52, 62 N. Y. Supp. 580, upon reargument, 51 App. Div. 430, 64 N. Y.

Supp. 745—determined the question now before us. In that case, which came up on demurrer, we held that the defendant was not liable for the penalty there sued for. I view the question presented on this appeal as an open one in this court.

This action is based upon refusals of the defendant to give to the plaintiff transfers which would entitle him to one continuous trip from a point on Twenty-Third street to a point on Broadway, upon the line of the Broadway & Seventh Avenue Railroad Company, and from a point on the Broadway & Seventh Avenue Line to a point on the Twenty-Third Street Line. The line of the Twenty-Third Street Railroad intersects the Broadway & Seventh Avenue Line at the corner of Twenty-Third street and Broadway. For a first cause of action, the plaintiff alleged that he boarded one of the defendant's cars at a point on Twenty-Third street east of Broadway, paid his fare, and at the same time demanded from the conductor a transfer to be used over the Broadway and Seventh avenue line from the intersection of the said line at Broadway and Twenty-Third street south to his destination, which was refused; and the plaintiff demands a judgment for the penalty prescribed by section 104 of the railroad law (chapter 676, p. 1406, Laws 1892). There were several other causes of action all based upon a similar refusal—some being for a refusal to give a transfer from the Broadway & Seventh Avenue Line to the Twenty-Third Street Line, and some from the Twenty-Third Street Line to the Broadway & Seventh Avenue Line; and the single question is presented as to whether the defendant, who was operating these two lines under a lease of a corporation who was the lessee of both the Broadway & Seventh Avenue Railroad and the Twenty-Third Street Railroad, was required by section 104 of the railroad law to give such a transfer.

Section 104 of the railroad law is contained in article 4 of that act, relating to street surface railroads. That article provides for the incorporation of street surface railroads, and the conditions under which such corporations may be authorized to construct a railroad upon and along the street, avenue, road, or highway in any city, town, or village of the state. The article contains no provision authorizing railroad corporations to make contracts with each other, but section 104 provides that:

"Every such corporation entering into such contract shall carry or permit any other party thereto to carry between any two points on the railroads or portions thereof embraced in such contract any passenger desiring to make one continuous trip between such points for one single fare, not higher than the fare lawfully chargeable by either of such corporations for an adult passenger. Every such corporation shall upon demand, and without extra charge, give to each passenger paying one single fare a transfer, entitling such passenger to one continuous trip to any point or portion of any railroad embraced in such contract, to the end that the public convenience may be promoted by the operation of the railroads embraced in such contract substantially as a single railroad with a single rate of fare."

And a penalty is provided for a refusal to comply with this provision.

By section 78 (page 1398) of the railroad law, authority is given for any railroad corporation, or any corporation owning or operating any railroad or railroad route within this state, to contract with any other such corporation for the use of their respective roads or routes, or any

part thereof; but that section contains a provision that "nothing in this section shall apply to any lease in existence prior to May the first, 1891." Article 3 of the statute of which section 78 is a part (Laws 1892, p. 1396, c. 676) authorizes the "consolidation, lease, sale and reorganization of railroad companies," and other sections of the article provide for the consolidation of one or more railroad companies.

The railroad law was originally enacted as chapter 565, p. 1082, of the Laws of 1890. Sections 103, 104, and 105 (page 1114) of that law were taken from sections 1, 3, and 4 of chapter 305, pp. 525, 526, of the Laws of 1885. It was amended in 1892, when sections 103 and 105, which were sections 1 and 3 of the act of 1885, were repealed, and section 4 of the act of 1885, re-enacted as section 105 of the railroad law of 1890, was inserted in the railroad law of 1892 as section 104.

By the railroad law of 1890, the provision of section 105, "Every such corporation entering into such contract," applied to a contract authorized by section 103 of the act; but, as section 103 was repealed by the amendment of 1892, section 105 of the act of 1890, which was made section 104 by the amendment of 1892, can only apply, as I understand it, to a contract made under section 78, which by express terms does not apply to a lease made prior to 1891. I cannot find that chapter 305, p. 525, of the Laws of 1885, has been repealed. It is not, however, necessary to consider whether or not the act of 1885 is in force, or what, if any, rights the plaintiff had under it, as the right of the plaintiff to recover is expressly limited by the complaint to a violation of section 104 of the railroad law of 1892. If section 104 of the railroad law does not apply, the Municipal Court was correct in awarding judgment for the defendant.

It seems to me that the refusal of the defendant to give to the plaintiff a transfer to ride from the point on the Twenty-Third Street Railroad Line to a point on the Broadway & Seventh Avenue Railroad Line, or a transfer to ride from a point on the Broadway & Seventh Avenue Railroad to a point on the Twenty-Third Street Line, was not a violation of section 104 of the railroad law, as amended in 1892. The Broadway & Seventh Avenue Railroad Company was incorporated under General Railroad Law of 1850 (Laws 1850, p. 211, c. 140), and by an indenture of lease dated the 13th of May, 1890, it leased all its railroads, including its leased lines, to the Houston, West Street & Pavonia Ferry Railroad Company. The Twenty-Third Street Railroad Company was organized under the general railroad act of 1850, and by an indenture of lease dated April 25, 1893, it leased to the Houston, West Street & Pavonia Ferry Railroad Company all its railroads, including leased lines, together with all the franchises, rights, powers, and privileges of the Twenty-Third Street Railroad Company; the Houston, West Street & Pavonia Ferry Railroad Company, thereby becoming the lessee of both roads. By an agreement dated April 29, 1893, the Houston, West Street & Pavonia Ferry Railroad Company consolidated with several other railroad corporations, and became the first Metropolitan Street Railway Company. The Metropolitan Street Railway Company, thus organized, subsequently consolidated with other companies and in April, 1902, the Metropolitan Street Railway Company, then operating both the Broadway & Seventh Avenue Railroad

Line and the Twenty-Third Street Railroad Line under these leases to the Houston, West Street & Pavonia Ferry Railroad Company, leased all its lines to the defendant, the Interurban Street Railway Company, a corporation organized in 1891, under the stock corporation law (chapter 564, p. 1066, of the Laws of 1890), to operate a railroad running from Mt. Vernon to Tuckahoe, in Westchester county. Thus, when the railroad law of 1892 was passed, the Houston, West Street & Pavonia Ferry Railroad Company was operating its line of road, and was also operating the Broadway & Seventh Avenue Line under a lease from that company. At that time the Twenty-Third Street Railroad Line was operated by the Twenty-Third Street Railroad Company, an independent corporation having no connection with either the Broadway & Seventh Avenue Railroad Company or the Houston, West Street & Pavonia Ferry Railroad Company, and there was consequently no obligation upon either company to give a passenger a transfer to ride upon the other line. Nothing contained in section 78 of the railroad law applied to this lease between the Broadway & Seventh Avenue Railroad and the Houston, West Street, & Pavonia Ferry Railroad.

This being the situation, the lease from the Twenty-Third Street Railroad Company to the Houston, West Street & Pavonia Ferry Railroad Company was executed and delivered. That lease, dated April 25, 1893, is between the Twenty-Third Street Railroad Company, party of the first part, and the Houston, West Street & Pavonia Ferry Railroad Company, party of the second part, and recites that the party of the first part owns and operates the street surface railroads and railroad routes in the city of New York upon Twenty-Third street from the North to the East river, and upon various other streets in the city of New York, and leases and operates the surface railroad and railroad route of the Bleecker Street & Fulton Ferry Railroad Company from Twenty-Third street, North river, to the Fulton Ferry and the Brooklyn Bridge; and the indenture granted, leased, and demised to the party of the second part and its successors all the railroads of the party of the first part, including the leased lines now or thereafter to be constructed and operated during the pendency of the lease, together with all the franchises, rights, powers, and privileges of the party of the first part to maintain, construct, and operate a railroad, to have and to hold the same unto the party of the second part, its successors and assigns, for the unexpired term of the charter of the party of the first part, and any extensions of the said charter; and, as a consideration for this demise, the party of the second part agreed to maintain, manage, use, and operate the line of railroads leased, to pay all taxes, assessments, and charges imposed upon the demised property, and to pay quarterly an annual rental of 18 per cent. on the par value of the capital stock of the party of the first part, and assumes all debts and obligations of the party of the second part. In this lease there is no mention of the lines of railroad operated by the lessee or by the Broadway & Seventh Avenue Railroad Company. Neither of these railroads is described in the lease, or in any way referred to therein, and it does not appear from the instrument that the lessee was the owner of or operating any line of railroad in the city of New York. As a fact, it

was at the time operating its own line of railroad, and also, under a lease with the Broadway & Seventh Avenue Railroad Company, it was operating that company's line of road; but that fact is not recited in the lease, and the only railroads described or referred to in the lease are the Twenty-Third Street Railroad and a railroad that the Twenty-Third Street Company was operating under a certain lease or agreement with it.

I think that section 104 of the railroad law applies to contracts made in pursuance of section 78 of that law. By the express provisions of section 78, however, that section did not apply to any lease in existence prior to May 1, 1891. The Houston, West Street & Pavonia Ferry Railroad Company was therefore operating a railway under a lease by the Broadway & Seventh Avenue Railroad Company made in April, 1890, and nothing in section 78 of the law applied to such a lease. Then section 104 provides that:

"Every such corporation entering into such contract [that is, such contract as is provided for by section 78] shall carry or permit any other party thereto to carry between any two points on the railroads or portions thereof embraced in such contract any passenger desiring to make one continuous trip between such points for a single fare."

Now, "such contract" was one made in pursuance of section 78 of the act; and if the Broadway & Seventh Avenue Railroad Company, or the Houston, West Street & Pavonia Ferry Railroad Company, had made a contract with the Twenty-Third Street Railroad Company, authorized by section 78 of the act, it was then obliged to carry any passenger desiring to make one continuous trip between any two points on the railroads, or portions thereof, embraced in such contract, and to give each passenger paying one single fare a transfer entitling such passenger to one continuous trip to any point or portion of any railroad embraced in such contract; but it was only to the road or roads or portions thereof embraced in the contract to which a passenger was entitled to a transfer. A line of railroad operated by the Houston, West Street & Pavonia Ferry Railroad Company under a lease at the time it received the lease from the Twenty-Third Street Company was not a railroad embraced in the lease of the Twenty-Third Street Road. As before stated, there is no recital in the lease that the lessee is operating any railroad. The Broadway & Seventh Avenue Line is not mentioned in any way in the lease. The lease of the Twenty-Third Street Line had no possible relation to or connection with the lease of the Broadway & Seventh Avenue Railroad, which was in existence before the passage of the act, and is by the express provisions of the act unaffected by its provision. The obligation to give a transfer is not imposed upon two roads which make contracts in relation to each other, but, where a contract is made between two railroad companies, the statute imposes an obligation upon both companies to give to a passenger a transfer from one road to the other between two points on the railroads or portions thereof which are embraced in such contract. If it had been intended by this provision to include all railroads operated by the contracting parties, it certainly would have been easy to say so, but that is not the obligation that is imposed. It is the right of a pass-

enger to be carried between any two points on the railroads, or portions thereof, embraced in such a contract; and this language negatives the intention of requiring each contracting railroad to give to passengers transfers to all portions of the lines operated by each contracting company, for the right is expressly limited to the railroad, or portion thereof, that is embraced in the contract. Now, as before stated, there was no portion of Broadway & Seventh Avenue Line embraced in any contract or lease made subsequent to May 1, 1891, or to which section 104 of the railroad act could apply. I think, therefore, that there was no obligation imposed upon the Houston, West Street & Pavonia Ferry Railroad Company to give a transfer from any portion of the Broadway & Seventh Avenue Line to a point on the Twenty-Third Street Line, or to carry passengers upon the Twenty-Third Street Line, which was imposed by the lease of the Twenty-Third Street Railroad Company to the Houston, West Street & Pavonia Ferry Railroad Company. Nor do I think that the subsequent consolidation which merged the Houston, West Street & Pavonia Ferry Railroad Company and other corporations into a new corporation, which was called the Metropolitan Street Railway, imposed such an obligation, or is included in the provisions of section 104 of the act. Neither the Broadway & Seventh Avenue Railroad Company, nor the Twenty-Third Street Railroad Company, was included in the corporations which were merged and became the Metropolitan Street Railway. They are still existing corporations, the owners of their respective lines and railroads; and the Metropolitan Street Railway Company, and subsequently the defendant corporation, came into possession of these railroads simply as the assignee of the original lessee. The defendant corporation is located in Westchester county, and has no connection with any portion of either the Twenty-Third Street Line or the Broadway & Seventh Avenue Line; and so the provisions of section 104 did not apply to this lease made between railroad companies owning or operating lines of railway within the city of New York, as it is expressly provided by section 104 that the "provisions of this section shall only apply to railroads wholly within the limits of any one incorporated city or village." I do not see how it can be said that the Broadway & Seventh Avenue Line, which was being operated by the Houston, West Street & Pavonia Ferry Railroad Company prior to the adopting of section ·78 of the railroad law, under a lease, was a railroad, or a portion of a railroad, embraced within the contract of lease made by and between the Twenty-Third Street Railroad Company and the Houston, West Street & Pavonia Ferry Railroad Company in 1893. In none of the consolidation agreements which resulted in the organization of the Metropolitan Railway was the Broadway & Seventh Avenue or the Twenty-Third Street Railroad mentioned or included within the contract. Neither of these roads has ever been consolidated with or become a part of the Metropolitan Railway System, and the lease of the Metropolitan Street Railway to the defendant was a lease of roads operated in the city of New York to a railroad company operating a line of railroad in the county of Westchester, and thus expressly excluded from the obligation imposed by the section.

My conclusion is that the determination of the Appellate Term must be reversed, with costs, and the judgment of the Municipal Court affirmed.

VAN BRUNT, P. J., concurs.

O'BRIEN, J. The history of the legislation bearing upon the subject of transfers shows that it has been the uniform policy with reference to franchises, dealing not alone with steam railroads, but with street surface railroads as well, that there should be no consolidation or leasing of competing lines; the theory being that it is in the interest of the public to have competing lines. It is conceded that this policy, as a favor to street railroads, has been departed from, but, in all the cases in which the right to consolidate or to lease contiguous lines has been granted, such leave or right was conditioned upon the corresponding benefit being conferred upon the public of obtaining a continuous ride for a single fare; and, to that end, it was the intent and purpose of the various acts to give to the public the right, over the lines leased or consolidated, to ride for a single fare. The present instance is not exceptional in the failure to express this idea clearly and in apt language. Having in mind the spirit and intent of the legislation, however, there is little difficulty, it seems to me, in reaching the conclusion that the language was intended to apply generally to all leases made by surface railroad companies, when leased by one to the other. The attempt, therefore, to limit this general policy by seizing on particular words in the statute which would have the act apply to leases made after a certain date, or dependent upon whether the passenger sought to ride on what before the lease was the lessor or the lessee company, is to do violence to the spirit and intent of the legislation. As I have stated, the statute aimed at requiring as a consideration or condition for the benefit and advantage which would flow to the railroad companies from permitting them to make leases through which there was practically effected a consolidation of two or more lines, that the public should receive, as an equivalent for the concession granted, the right, for one fare, to be transferred over the leased lines.

As to construing the statute in detail, I do not think it necessary to add to what was said in the opinion of this court in Mendoza v. Met. St. Ry. Co., 51 App. Div. 430, 64 N. Y. Supp. 745, or to what has been said herein by the learned Appellate Term. For the reasons stated in those opinions, therefore, I think that the determination of the Appellate Term should be affirmed, with costs.