in his possession, and subsequently they were returned to the plaintiff. No use was ever made of the plans. No building was ever erected. No acceptance of the services of the plaintiff was proved, from which an employment or acceptance of the plaintiff's services could be inferred. The cause of action, which alleges an employment, and rendition of services thereunder, is entirely unproved; and I think that the defendants were therefore entitled to the direction of a verdict. But assuming that the position taken by the learned court was correct, and that under this complaint the plaintiff could recover for the value of any services that were actually rendered to the defendants' testator and accepted by him, the proof fails to show that he ever accepted the plans, used them in any way, or that they were ever of any value to him. He had them in his possession for some months. He told a person who applied to him to know the price at which the property would be sold that he had plans prepared by the plaintiff that would show a certain result as to the rental value of the building to be erected according to those plans, and that is all. This statement of the defendants' testator is entirely consistent with the fact that the plaintiff had prepared these plans and submitted them to the defendants' testator without any employment or agreement as to compensation, and that the defendants' testator had considered them and declined to accept them—a condition which would preclude the plaintiff from any recovery. The complaint alleges that these plans were submitted under such an arrangement, but there is no evidence to justify a finding that there was any subsequent employment of the plaintiff, an agreement to pay him for the plans, or an acceptance or use of the plans, which would imply a contract to pay for them; and the defendants were therefore entitled to have the jury so instructed.

It follows that the judgment and order appealed from must be reversed, and a new trial ordered, with costs to the appellants to abide the event. All concur; PATTERSON, J., in result.

---

McLAUGHLIN v. NEW YORK CITY RY. CO. (three cases).

(Supreme Court, Appellate Division, Second Department. June 29, 1905.)

1. STREET RAILROADS—TRANSFERS—LEASED LINES.

Laws 1892, p. 1398, c. 676 (Railroad Law) § 78, provides that any railroad may contract with any other railroad for the use of their respective roads, but further provides that nothing therein shall apply to any lease in existence prior to May 1, 1891. Section 104 (Laws 1892, p. 1406, c. 676) requires "every such corporation entering into such contract" to issue transfers entitling passengers to a continuous trip to any point or portion of any railroad embraced in the contract. The Broadway Railroad Company on May 13, 1890, leased its line to the Houston Company. On April 25, 1893, the Twenty-Third Street Railroad Company also leased its line to the Houston Company, which afterwards consolidated with the Metropolitan Street Railway Company, which transferred its rights to the New York City Railway Company. Held, that since the lease of the Twenty-Third street line to the Houston road was made subsequent to May 1, 1891, the City Railway Company is bound to transfer

passengers between the Twenty-Third street and Broadway lines, although the lease of the Broadway line to the Houston road was in existence prior to that date.

2. SAME—RIGHT TO PENALTY—PAYMENT OF FARE—PAYMENT BY ESCORT.

Under Laws 1892, p. 1406, c. 676 (Railroad Law) § 104, requiring railroads operating within a city "upon demand and without extra charge [to] give to each passenger paying one single fare, a transfer," etc., and providing that, "for every refusal to comply with the requirements of this section, the corporation so refusing shall forfeit $50 to the aggrieved party," a passenger for whom a transfer was rightfully demanded is entitled to recover the statutory penalty for the conductor's refusal to give her one, although her fare was paid not by herself, but by her escort.

3. SAME—ACTIONS FOR PENALTIES—WAIVER OF PREVIOUS PENALTIES.

Where three actions to recover separate penalties prescribed by Laws 1892, p. 1406, c. 676 (Railroad Law), § 104, for the refusal of a street railroad to issue transfers to plaintiff, are commenced on the same day, the institution of the action for the penalty last incurred is a waiver of previous penalties, and plaintiff is entitled to recover only the single penalty incurred.

Appeal from Municipal Court, Borough of Brooklyn, Third District.

Three actions by Mary E. McLaughlin against the New York City Railway Company. From judgments for plaintiff, defendant appeals. Judgments in two actions reversed, and in the third modified and affirmed.

Argued before HIRSCHBERG, P. J., and BARTLETT, JENKS, RICH, and MILLER, JJ.

Joseph P. Cotton, Jr., for appellant.
Frederick N. Van Zandt, for respondent.

PER CURIAM. The plaintiff has had the judgment of the Municipal Court in these three actions, in the aggregate for 10 penalties, of $50 each, recovered under the provisions of section 104 of the railroad law (Laws 1892, p. 1406, c. 676). On five occasions while she was a passenger on the line of street railway operated by the defendant on Twenty-Third street, in the borough of Manhattan, city of New York, she was refused a transfer to entitle her to passage on the line of street railway operated by the defendant in Broadway in that borough, from the intersection of that thoroughfare with Twenty-Third street, and on five occasions she was refused a transfer from the Broadway line to that in Twenty-Third street; in each case compelled to pay a second fare after she changed cars. Section 104 of the railroad law reads as follows:

"Every such corporation entering into such contract shall carry or permit any other party thereto to carry between any two points on the railroads or portions thereof embraced in such contract any passenger desiring to make one continuous trip between such points for one single fare, not higher than the fare lawfully chargeable by either of such corporations for an adult passenger. Every such corporation shall upon demand, and without extra charge, give to each passenger paying one single fare a transfer, entitling such passenger to one continuous trip to any point or portion of any railroad embraced in such contract, to the end that the public convenience may be promoted by the operation of the railroads embraced in such contract substantially as a single railroad with a single rate of fare. For every refusal to comply with the requirements of this section the corporation so refusing shall

forfeit fifty dollars to the aggrieved party. The provisions of this section shall only apply to railroads wholly within the limits of any one incorporated city or village."

The language of that section, "Every such corporation entering into such contract," etc., refers to "any railroad corporation or any corporation owning or operating any railroad or railroad route, within this state," which latter is the language of section 78 of the railroad law (Laws 1892, p. 1398, c. 676). After a careful and exhaustive review of the history of the legislation which has resulted in the enactment of the relevant sections of the railroad law, the Court of Appeals, in Griffin v. Interurban Street Railway Co., 179 N. Y. 438, 72 N. E. 513, has decided that sections 78 and 104 of the railroad law must be read together, and that the corporation and contract referred to in the latter section are those which are the subject of consideration in section 78. Section 78 reads as follows:

"Any railroad corporation or any corporation owning or operating any railroad or railroad route within this state may contract with any other such corporation for the use of their respective roads or routes, or any part thereof, and thereafter use the same in such manner and for such time as may be prescribed in such contract. Such contract may provide for the exchange or guaranty of the stock and bonds of either of such corporations by the other and shall be executed by the contracting corporations under the corporate seal of each corporation, and if such contract shall be a lease of any such road and for a longer period than one year, such contract shall not be binding or valid unless approved by the votes of stockholders owning at least two-thirds of the stock of each corporation which is represented and voted upon in person or by proxy at a meeting, called separately for that purpose upon a notice stating the time, place and object of the meeting, served at least thirty days previously upon each stockholder personally, or mailed to him at his post-office address and also published at least once a week, for four weeks successively, in some newspaper printed in the city, town or county where such corporation has its principal office, and there shall be indorsed upon the contract the certificate of the secretaries of the respective corporations under the seals thereof, to the effect that the same has been approved by such votes of the stockholders, and the contract shall be executed in duplicate and filed in the offices where the certificates of incorporation of the contracting corporations are filed. The road of a corporation can not be used under any such contract in a manner inconsistent with the provisions of law applicable to its use by the corporation owning the same at the time of the execution of the contract. Such contracts shall be executed by the corporations, parties thereto, and proved and acknowledged in such manner as to entitle the same to be recorded in the office of the clerk or register of each county through or into which the road so to be used shall run. Nothing in this section shall apply to any lease in existence prior to May first, eighteen hundred and ninety-one."

It appears in this case that the defendant, the New York City Railway Company, is a domestic corporation, and has been since and prior to February 14, 1902; that the Broadway & Seventh Avenue Railroad Company is now, and was prior to May 13, 1890, a domestic street railroad corporation, and, as such, owned and operated prior to that date a line of street surface railroad upon Broadway, in the Borough of Manhattan, crossing Twenty-Third street, and that the line was wholly within the territorial limits of the city of New York; that the Twenty-Third Street Railway Company is now, and was prior to April 25, 1893, a domestic street railway corporation, and, as such, owned and operated prior to that day a line of street surface railway upon Twenty-Third street, in the bor-

ough of Manhattan, crossing Broadway; and that that line was wholly within the territorial limits of the city of New York. It also appears that the Houston, West Street &·Pavonia Ferry Railroad Company was prior to May 13, 1890, and up to December 3, 1893, a domestic street railroad corporation, operating lines of street surface railroad wholly within the territorial limits of the city of New York. On the 13th day of May, 1890, the Broadway & Seventh Avenue Railroad Company, by contract with the Houston, West Street & Pavonia Ferry Railroad Company, leased all its railroad and railroad routes to the Houston, West Street & Pavonia Ferry Railroad Company, including the line in Broadway, and thereafter, and up to the 13th day of December, 1893, in pursuance of that contract, the Houston, West Street & Pavonia Ferry Railroad Company operated the lines of the Broadway & Seventh Avenue Railroad Company, all of which lines were wholly within the territorial limits of the city of New York. On the 25th day of April, 1893, the Twenty-Third Street Railroad Company, by contract with the Houston, West Street & Pavonia Ferry Railroad Company, leased all its railroads and railroad routes to the latter company, including the line in Twenty-Third street, and thereafter, and up to the 13th day of December, 1893, in pursuance of the lease, the Houston, West Street & Pavonia Ferry Railroad Company operated the Twenty-Third street line, all of which lines were wholly within the territorial limits of the city of New York. On the 13th day of December, 1893, the Houston, West Street & Pavonia Ferry Railroad Company was consolidated into the Metropolitan Street Railway Company, which until about the 14th day of February, 1902, operated the lines in Broadway and Twenty-Third street to which reference has been made. On the 14th day of February, 1902, the Metropolitan Street Railway Company transferred to the defendant all its rights to operate said roads under and by virtue of the said contracts and leases. And thereafter and at the times the plaintiff was refused transfers it operated and controlled the said lines.

The subject of the liability of the railroad company operating the lines in Twenty-Third street and Broadway to pay the penalty provided in section 104 of the railroad law was the subject of discussion in Topham v. Interurban Street Railroad Co., 196 App. Div. 323, 89 N. Y. Supp. 298, in the First Department of this court. At the time that action was commenced the Interurban Street Railway Company was operating these two lines of road. It was there decided by Mr. Justice Ingraham that the defendant was not required, pursuant to the provisions of section 104 of the railroad law, to give a passenger a transfer from the Broadway line to the Twenty-Third street line, or vice versa, and his decision was concurred in by three of the members of the court who sat in the case. That case was decided after the trial in the Municipal Court of the actions now under review. Since the decision in the Topham Case, the Court of Appeals has decided the cases of Griffin v. Interurban Street Railway Co., 179 N. Y. 438, 72 N. E. 513, and O'Reilly v. Brooklyn Heights Railroad Co., 179 N. Y. 450, 72 N. E. 517. By reason of these decisions in the Court of Appeals, and more particu-

larly that in the O'Reilly Case, we are of opinion that the decision of the First Department in the Topham Case does not correctly state the law as it now exists. It was there held that because the lease of the Broadway & Seventh Avenue Railroad Company to the Houston, West Street & Pavonia Ferry Railroad Company was entered into on the 13th day of May, 1890, the provisions of section 78 of the railroad law do not apply, inasmuch as the language of the last sentence of that section distinctly exempts from its operation leases in existence prior to May 1, 1891; that the penalty provided for in section 140 (page 1416) did not attach to the defendant, because one of the leases in the chain by which it operated both of the lines in question was executed prior to May 1, 1891; and that therefore that section, read in connection with section 78, did not contemplate such a situation. In the light of what the Court of Appeals has said in the O'Reilly Case, we are unable to concur in this view. The Broadway & Seventh Avenue Railroad Company leased its Broadway line to the Houston, West Street & Pavonia Ferry Railroad Company, and the latter then became a railroad corporation owning and operating a railroad or railroad route within this state. From that day until the transfer to the Metropolitan Street Railway Company, the Houston, West Street & Pavonia Ferry Railroad Company possessed, so far as its capacity to contract with the Twenty-Third Street Railroad Company under section 78 of the railroad law, an entirety made up of its two parts— the Houston, West Street & Pavonia Ferry Railroad Company street railway lines proper, and those of the Broadway & Seventh Avenue Railroad Company. When the Twenty-Third Street Railroad Company leased its lines to the Houston, West Street & Pavonia Ferry Railroad Company, on the 25th day of April, 1893, it found the latter to be a railroad corporation, owning and operating a railroad route within this state, which is the language of section 78 as amended. In ·O'Reilly v. Brooklyn Heights Railroad Company, supra, the Court of Appeals held that when a street surface railroad company has leased by separate leases the lines of two other companies, and is operating them in connection with its system, it is bound to transfer passengers, for a single fare, from one of such leased lines to the other, and vice versa. In this connection the court, per curiam, said:

"In order to determine this question, we think it important to first consider the nature of the obligation of the defendant company, arising under the statute, upon its executing the lease of the Brooklyn City Railroad Company. It will be observed that the language of the statute is that 'every such corporation entering into such contract shall carry,' etc. The obligation to carry therefore arises from the entering into the contract. The defendant company was the lessee, and entered into the contract with the lessor; thereby undertaking to operate the roads of the lessor company. When a street surface railroad company, engaged in the operation of a railroad under the statute, leases another railroad, and commences to operate the same, which roads intersect each other, the evident purpose of the act was that they should be deemed 'embraced' in the contract, and that passengers should be transferred from one road onto the other, so as to entitle 'such passenger to one continuous trip to any point or portion of any railroad embraced in such contract, to the end that the public convenience may be promoted by the op-

eration of the railroads embraced in such contract, substantially as a single railroad, with a single rate of fare.' We think, therefore, that a fair and reasonable construction of the statute is that the lessee railroad, in taking a lease of another railroad, undertakes to transfer passengers from its own line to that of the leased line, and vice versa. If we are correct in this construction, it would then follow that, when the defendant company subsequently leased the Vanderbilt avenue line of the Nassau Electric Railroad Company, it undertook to transfer passengers from the Vanderbilt avenue line over its own road, and thence, by its former lease, to transfer passengers over the Brooklyn City lines, and vice versa. In other words, the roads leased by the defendant company, in effect, became the roads of that company, operated by it, and 'when it leased other roads and commenced their operation the obligation was to transfer passengers over all of the roads operated by it for a single fare."

Section 104 of the railroad law gave the plaintiff her right to transfer when one line was leased to a company owning or operating other lines, and the only lease which it is necessary to consider, so far as the date of its execution is concerned, in determining whether her cause of action is good, is the lease of the Twenty-Third street line to the Houston, West Street & Pavonia Ferry Railroad Company, of April 25, 1893, for on that date the Twenty-Third Street Company leased its lines to a corporation owning and operating the line in Broadway; and, in the light of this language of section 78, as construed by the Court of Appeals in the second case referred to, it matters little how it came about that the Broadway line was being operated by the Houston, West Street & Pavonia Ferry Railroad Company—whether by purchase, lease, license, or sufferance. So long as it was operating the Broadway line, the lease of the Twenty-Third street line gave the plaintiff her right to transfer under section 104; and inasmuch as this lease did not exist prior to the 1st day of May, 1891, the date of limitation mentioned in the last sentence of section 78, that section applied in its fullness to the lease in question, and the provisions of section 104 contemplated the Houston, West Street & Pavonia Ferry Railroad Company and its transaction with the Twenty-Third Street Company. The leases and transfers since the 25th day of April, 1893, it is unnecessary to consider in this connection, for by its mesne leases and transfers the same control over the two lines in question is now possessed by the defendant as was possessed by the Houston, West Street & Pavonia Ferry Railroad Company immediately upon the execution and delivery of the lease of April 25, 1893.

The appellant presents the further question that, inasmuch as the plaintiff's fares in these three actions were in each instance paid by her escort, she is not entitled to sue for a recovery of the penalties. It is to be noted that the reading of the section is that "every corporation shall upon demand and without extra charge give to each passenger paying one single fare, a transfer," etc.; and, in our view, it matters not whether the plaintiff paid her own fare, or whether another paid it out of money that did or did not belong to her, so long as the payment was made for her, that she might lawfully remain a passenger, and so long as she did actually lawfully become and remain a passenger. The section further provides that, "for

every refusal to comply with the requirement of this section, the corporation so refusing shall forfeit fifty dollars to the aggrieved party." That the plaintiff was the aggrieved party cannot reasonably be doubted. She was a passenger, and it was to enable herself to ride upon one of the connecting lines of cars that the transfer was demanded. Defendant's refusal compelled her to pay another fare, and it matters not whether it was necessary for her to pay her second fare herself, or whether she might obtain some other person to pay it for her; the primary liability to pay if she continued her ride was upon her. The construction advocated by the appellant would be strained in the extreme, and would tend to defeat the very object of the statute.

The only other point remaining to be discussed in these cases is the amount of recovery the plaintiff is entitled to. Although section 104 of the railroad law provides that "for every refusal to comply with the requirements of this section, the corporation so refusing shall forfeit fifty dollars," etc., the Court of Appeals has held in Griffin v. Interurban Street Railway Company, supra, that changed conditions in our modern life require that henceforth, if cumulative recoveries are to be permitted, the Legislature should state its intention in so many words, or make a more definite form of statement than that hitherto deemed sufficient, and announces the rule, as it shall henceforth be, in the following language (page 449 of 179 N. Y., page 517 of 72 N. E.):

"A sound public policy requires that only one penalty should be recovered in a single action, and that the institution of an action for a penalty is to be regarded as a waiver of all previous penalties incurred."

The plaintiff has in these three actions recovered a $50 penalty for each of ten violations of the statute. In action No. 1 she has recovered two penalties incurred on August 25, 1903, and two incurred on September 2, 1903; in action No. 2 she has recovered one penalty incurred on November 3, 1903, one incurred on November 4, 1903, and one incurred on November 26, 1903; and in action No. 3 she has recovered one penalty incurred on November 26, 1903, and two incurred on January 30, 1904. Had each action been commenced immediately after the penalties recovered therein had been incurred, and before the penalties had been incurred which have been recovered in the subsequent action, a single penalty might probably lawfully have been recovered in each. But all three actions were commenced on the same day, namely, March 16, 1904, and, under the rule cited, to the effect that the institution of an action for a penalty is to be now regarded as a waiver of all previous penalties incurred, it must be held that the plaintiff is only entitled to recover in these actions for a single penalty incurred on the last day, namely, January 30, 1904.

It follows that the judgments in action No. 1 and in action No. 2 must be reversed, and the complaints dismissed, and that the judgment in action No. 3 must be modified so as to reduce the recovery to that of one penalty, of $50, all without costs of this appeal to either party.